BEAN, (ALKAN v.) See Case No. 202.

## Case No. 1,167.

### BEAN v. AMSINCK et al.

[10 Blatchf. 361;[1] 12 Am. Law Reg. (N. S.) 379; 8 N. B. R. 228.]

Circuit Court, S. D. New York. Jan. Term, 1873.[2]

BANKRUPTCY — PARTNERSHIP — COMPOSITION — FRAUDULENT PREFERENCE — SUIT BY ASSIGNEE OF PARTNER.

1. Where several creditors enter into a composition arrangement with their debtor, by deed, it is a constructive fraud on the other creditors signing the deed, for one creditor who signs to enter into a secret arrangement with the debtor, for an advantage over the other creditors, in respect to his debt.

[Cited in Bean v. Brookmire, Case No. 1,170; Re Jewett, Id. 7,306; Fairbanks v. Amoskeag Nat. Bank, 38 Fed. 634.]

2. Securing 50 per cent., in cash, at once, instead of 70 per cent. on time, is such an advantage, when obtained secretly, where the taking of the cash payment so embarrasses the debtor as to make it impossible for him to meet his payments to the other creditors, as they mature.

[Cited in Fairbanks v. Amoskeag Nat. Bank, 38 Fed. 634.]

3. Where such a fraud has been committed, and the debtor afterwards is adjudged a bankrupt, his assignee in bankruptcy may recover

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Reversed in 22 Wall. (89 U. S.) 395.]

from the creditor receiving such cash payment, the amount so paid.

4. In this case, it was held, that the fact, that the composition deed was, by its terms, not to be binding on any creditor unless all the creditors signed it, and all did not sign it, and the further fact, that the agent who signed it for the favored creditor was authorized to sign it only after all the other creditors had signed it, did not, on the facts of this case, exempt such favored creditor from his liability to repay the money to the assignee in bankruptcy.

[5. A partner in an insolvent firm executed a composition deed with the firm creditors, referring to them as "his creditors," and, in pursuance thereof, signed compromise notes in the firm name. The creditors regarded the firm as dissolved, and the assets as having been placed in his hands for settlement. He then made payments from the firm's funds in fraud of the rights of such creditors, and was afterwards himself declared a bankrupt. *Held*, that his assignee in bankruptcy can, in the interest of the firm creditors, recover the sums so paid in fraud of their rights.]

[See note at end of case.]

[In equity. Bill by William C. Bean, assignee in bankruptcy of Charles S. Kintzing, against Louis E. Amsinck & Co., for an accounting, and for the recovery of money alleged to have been paid in fraud of the rights of other creditors of Charles S. Kintzing & Co., of which firm Kintzing was a member until a short time before the commencement of the proceedings in which he was adjudged a bankrupt. Decree for plaintiff.

[Subsequently, on defendants' appeal to the supreme court, this decree was reversed, and the case remanded to this court, with directions to dismiss the bill of complaint. Amsinck v. Bean, 22 Wall. (89 U. S.) 395.]

Edward B. Merrill, for plaintiff.

Augustus F. Smith, for defendants.

BLATCHFORD, District Judge. On the 15th of February, 1869, the firm of Charles S. Kintzing & Co., of St. Louis, Missouri, composed of Charles S. Kintzing and Malcolm S. Lindsley, was indebted to the defendants, who then composed, and still compose, the firm of L. E. Amsinck & Co., of New York, in the sum of $32,551 65. Kintzing & Co. were also very largely indebted to many other persons, and, having stopped payment, a meeting of their creditors was held at St. Louis, about that date, at which a statement of their financial affairs was presented, showing their condition on the 8th of February, 1869, in which their liabilities were placed at $179,299 54 and their assets at $204,602 80. In the latter amount there were only $77,344 26 of accounts considered good, merchandise and cash, while the rest of the assets consisted of $51,704 50 of suspended debts, $10,167 35 of doubtful claims, and $65,386 69, "due from Montana branch." The business of Kintzing & Co. was the wholesale grocery business. For the purpose of making a compromise with their creditors, an agreement in these words was prepared and presented for signature to such creditors: "Articles of agreement made and

2FED.CAS.—71

entered into this 15th day of February, A. D. 1869, between Charles S. Kintzing & Co., of the city of St. Louis, and his creditors, witnesseth, that we, the undersigned creditors of said Charles S. Kintzing & Co., for and in consideration of one dollar to each of us paid by said firm, and for divers other good and valuable considerations, agree to accept, in full payment and satisfaction, seventy (70) cents on the dollar, for the entire indebtedness of said firm to us respectively, as shown by the amounts set opposite our signatures hereto, to be divided up into three equal payments, at six (6), twelve (12) and eighteen (18) months respectively from the date hereof, without interest, and is evidenced by three (3) negotiable notes of Charles S. Kintzing & Co., of even date herewith, and, on the payment of which, said firm is to be released from all liability on account of said indebtedness; and be it further known, that we have entered into this compromise with said firm of Charles S. Kintzing & Co., after hearing and seeing a statement of Messrs. Kintzing & Co.'s books, assets and effects, and find that it is the best, in our judgment, that can be done for the interest of all concerned; and, further, that we have full confidence in the integrity of Charles S. Kintzing, and his ability to settle up the business better than any one we could appoint; but it is further expressly agreed and understood, that this composition is not to be binding on any one, unless agreed to and signed by all of the creditors of said firm. In witness whereof, we have hereto set our respective names, and desire the co-operation of all the creditors with us in this compromise." This composition agreement was ultimately signed by sixty-three of the creditors, including the defendants, the aggregate of whose debts, as set opposite their signatures, amounted to $153,558 21. The debt due to the defendants was more than double that due to any other one creditor. For the purpose of procuring the signature of the defendants to the agreement, Kintzing went to New York and had an interview with one of the defendants, and desired their assent to the compromise, to which the reply was, that, if he could obtain the assent of the other creditors, the defendants would not stand in the way, if Kintzing would afterwards pay them fifty cents on the dollar, on the amount of the indebtedness, in the manner stated in the letter of March 8th, 1869, hereafter referred to. An agreement to that effect being verbally made between Kintzing and the defendants, the latter, under date of New York, March 8th, 1869, wrote, and signed, and sent to the firm of F. A. Reuss & Co., of St. Louis, a letter, in the following words, addressed to that firm, at St. Louis, which they delivered to Kintzing, in New York, and which he carried to St. Louis: "We hereby authorize you to sign, as our attorneys, the agreement entered into by Chas. S. Kintzing & Co. with their

creditors, accepting their extension notes for 6, 12, and 18 mos., for seventy per cent. of their indebtedness, under the following conditions: (1.) That all other creditors must have signed before us; (2.) That Chas. S. Kintzing & Co. discount their extension notes, upon your signing said agreement, paying for them $5,808 27 in cash, on or before the 15th inst., $5,233 78 in their new note due 1–4 April, $5,233 78 in their new note due 1–4 May—$16,275 83, say, sixteen thousand two hundred and seventy-five 83/100 dollars in all; (3.) That, upon your lawyer's advice, Chas. S. Kintzing & Co. have a legal right to enter into the above arrangement with us. Referring you, for further particulars, to our letter by mail, we remain," &c. F. A. Reuss & Co. received from the defendants, otherwise than through the letter so given to Kintzing, instructions the same in substance as those contained in that letter. After sixty-two of the creditors, representing debts put down at $121,006 56, had signed the agreement, F. A. Reuss & Co., on the 15th of March, 1869, signed it thus: "L. E. Amsinck & Co., by F. A. Reuss & Co., their Att'y, 32,551 65," that signature being the last one which appears appended to the agreement. Whether, at the time Reuss & Co. so signed, Kintzing gave to them, for the defendants, three notes, according to the terms of the agreement, payable in 6, 12, and 18 months, dated February 15th, 1869, for seventy per cent. of the $32,551 65, does not, perhaps, clearly appear; but, when Reuss & Co. so signed, Kintzing gave to them, for the defendants, $5,808 27 in cash, and two notes, each dated St. Louis, March 2d, 1869, each for $5,233 78, one payable thirty days after date, and the other payable sixty days after date, each signed Chas. S. Kintzing & Co., and each payable to the order of the defendants' firm, one to become due April 1–4, the other May 1–4. On the 16th of March, Reuss & Co. wrote a letter to the defendants, reporting thus: "Have signed in your name the list of K. creditors. Mr. K. came up last night, and brought us cash and notes as per agreement. Our lawyer satisfied himself so much that all K.'s cred. have signed the 70c. The 2 notes you find enclosed, you may return us the same properly endorsed, and, in case K. don't come up, we promise you to be after him again." The letter also accounted with the defendants for the $5,808 27 cash. The two notes were received by the defendants, and endorsed by them, each payable to F. A. Reuss & Co., or order, and returned by the defendants to F. A. Reuss & Co. Reuss & Co. received payment of the notes in full from Kintzing, and remitted the amount to the defendants, $2,-500 being paid on the 3d of April, 1869; $2,-733 78 on the 10th of April, 1869; $3,000 on the 4th of May, 1869; and $2,233 78 on the 11th of May, 1869. Thirty-three creditors, with debts to the amount of $2,313 53, did not sign the compromise agreement.

From and after time when the firm of

Charles S. Kintzing & Co. so suspended payment, it seems to have been regarded by the partners in it, Kintzing and Lindsley, as dissolved. The assets, with the tacit assent of Lindsley, passed into the exclusive possession of Kintzing, for administration for the benefit of the creditors of the firm, as contemplated by the terms of the compromise agreement. Lindsley was largely in debt to the firm. Kintzing took the stock of merchandise, and, making new purchases on his own account, went on in business, in St. Louis, in his own name, from about the 1st of March, 1869, selling the old stock and the new stock, and mingling the funds arising from the goods and assets of Charles S. Kintzing & Co. with those arising from his new individual business, although he kept a separate set of books for each business. The moneys paid to the defendants were paid out of such mingled funds.

After so settling with the defendants, on the 15th of March, Kintzing proceeded to send to the other creditors who had signed the compromise agreement, six, twelve and eighteen months' notes, made by Charles S. Kintzing & Co., for the 70 per cent. The first of the six months' notes matured on the 18th of August. None of them were paid at that date. The amount of them maturing on that day was $24,768 39. The amount of the compromise notes outstanding on the 18th of August, to mature after that date, was $45,-795 26. Kintzing continued to carry on business until the 18th of August, and, on the 21st of August, made a voluntary assignment of all his property, in trust for his creditors, to one Pritchard, under the laws of Missouri. Comparatively small sums were realized from the assets of Kintzing & Co., before mentioned. Of the $65,386 69 due from Montana branch, $200 in cash was received and $17,000 in notes. Of the $22,265 64, accounts considered good, Kintzing collected about $6,000. The stock of merchandise depreciated to some extent. Between February 15th and August 1st, Kintzing paid to creditors of the firm, other than the defendants, $5,836 02. From the 15th of February to the 18th of August, the total cash receipts by Kintzing were about $75,000, and the cash payments were $103,000. The amount of merchandise purchased by Kintzing after the 15th of February was about $32,000. The total amount of sales of merchandise by Kintzing from the 15th of February to the 18th of August, was $62,189 59. Of this amount he received about $54,000 in cash prior to the 18th of August. Kintzing did not, when the creditors signed the agreement, or when the compromise notes were delivered to such creditors, inform any of them of the arrangement made with the defendants, nor does it appear that any creditors knew of it, other than the defendants. There was turned over to Pritchard, under the assignment to him, a quantity of merchandise and notes and accounts, and a small sum in cash. He sold

the merchandise, and collected some of the notes and accounts, and afterwards turned over to the plaintiff $11,199 in cash and the uncollected notes and accounts, amounting to $42,771 58, of which the plaintiff has been able to collect only $453 25.

On the 17th of September, 1869, creditors holding some of the six months' compromise notes, signed Charles S. Kintzing & Co., and dated February 15th, 1869, presented a petition thereon, to the district court of the United States for the eastern district of Missouri, alleging that they "are creditors of Charles S. Kintzing, a member of the late firm of Charles S. Kintzing & Co.," the indebtedness being the said notes, which are averred, in the petition, to have been given to the petitioners by Kintzing, and alleging various acts of bankruptcy to have been committed by Kintzing, and, among others, a preferential payment to the defendants of the sums so paid, and praying that "the said Charles S. Kintzing, doing business as aforesaid, under the style and firm of Charles S. Kintzing & Co.," be declared bankrupt, and his estate be distributed according to law. Kintzing was adjudicated a bankrupt on such petition, and an assignment, under the act, of "all the estate, real and personal, of the said Charles S. Kintzing, bankrupt aforesaid, including all the property of whatever kind of which he was possessed, or in which he was interested, or entitled to have, on the 17th day of September, A. D., 1869," was executed to the plaintiff, in due form, on the 4th of January, 1870.

The bill alleges, that the arrangement between Kintzing and the defendants was a fraudulent agreement, on the part of the defendants, with the intent of deceiving and cheating the other creditors of Kintzing, and with a view to obtain a fraudulent advantage over them; that the payments were made by Kintzing to Reuss & Co., as the agents of the defendants, in pursuance of the said fraudulent agreement, and in violation of the compromise agreement; that the defendants concealed the fraudulent agreement, and the payments, from the other creditors of Kintzing and of the firm of Charles S. Kintzing & Co.; and that said creditors were deceived, to their damage. The prayer of the bill is, that all the payments so made by Kintzing to the defendants may be decreed to have been made in fraud of the other creditors of Kintzing and of Charles S. Kintzing & Co.; that the defendants may be decreed to account for, and pay over, to the plaintiff the sums of money so paid to them by Kintzing, and to render a full account of all moneys paid to them by Kintzing, or by Charles S. Kintzing & Co., since February 15th, 1869; and that all the property and effects, both of Kintzing and of the said firm of Charles S. Kintzing & Co., may be decreed to have vested in the plaintiff, as such assignee in bankruptcy.

The answer denies that an agreement was made which was fraudulent, or made with an intent, on the part of the defendants, to deceive or cheat the other creditors of Kintzing, or with a view, on their part, to obtain a fraudulent preference over the said other creditors. It admits, that, subsequently to the 15th of February, 1869, Reuss & Co., by the authority of the defendants, signed, in the firm name of the defendants, the compromise agreement. It denies that any money paid to the defendants vested in the plaintiff. It avers, that the defendants received the payments, believing, after the compromise agreement was signed, that Charles S. Kintzing & Co. were solvent, and able to pay all their then debts; that the other creditors also so believed; that, in consideration of the payments, they discharged Charles S. Kintzing & Co. from all liability, which, under the compromise agreement, amounted to $22,786 15; that the transaction can, in no respect, be questioned by the plaintiff, in consequence of its being contrary to public policy, in respect to its infringement of the terms of the compromise agreement; that, at the time of the filing of the petition in bankruptcy, Lindsley was a partner of Kintzing, under the firm name of Charles S. Kintzing & Co., and the debts claimed by the creditors by whom said petition was filed, were contracted by said firm, so composed, the members of which were, both of them, liable, as such partners, to said creditors, on said debts, at the time the petition was filed, and afterwards; that Lindsley was not made a party to the bankruptcy proceedings, or adjudged bankrupt, although he was alive, and resided in the United States; that, therefore, the court in Missouri never acquired jurisdiction of the proceedings, so as to adjudge Kintzing to be bankrupt; and that the plaintiff, by his appointment as assignee, never acquired any title to any of the estate of said firm of Charles S. Kintzing & Co., or to the claim or cause of action set forth in the bill.

The principle upon which the plaintiff seeks a recovery, in this case, is well settled. Such a transaction as that in which the defendants engaged was a constructive fraud on the other creditors. Those who entered into the composition agreed, by its terms, to accept the seventy per cent. in full payment and satisfaction of their claims, relying on the statement which had been exhibited to them, of the books, assets, and effects of their debtors, and, in substance, constituting Kintzing their trustee, to take such assets and effects, and settle up the business, by applying such assets and effects to the payment of the compromise notes. Such an arrangement was necessarily based on the good faith of all the creditors entering into the composition, in their dealings with the debtors, and with each other; and there could be no good faith, either towards the debtors, or towards the other creditors, when one creditor obtained, by a secret arrange-

ment with the debtors, [under circumstances][3] which amounted to coercion and duress upon the debtors, the advantage of an early, certain cash payment of one-half of his debt, which resulted in making the debtors unable to pay to the other creditors any part of the seventy per cent. for which they bargained. They supposed the favored creditors were acting in good faith, in agreeing to the same terms they agreed to; whereas, it turns out that such favored creditors have been bribed to hold themselves out as agreeing to such terms. Secret agreements of that kind are held void, both by courts of law and courts of equity, and are not enforced, even against the assenting debtor, or his sureties, or his friends. Public policy, and the interests of unsuspecting and deceived creditors, forbid the enforcement of such secret agreements; and it makes no difference whether threats or oppression were used to induce the debtor to consent to the secret agreement, or whether he was merely a volunteer, offering his services, and aiding in the intended deception. 1 Story, Eq. Jur. §§ 378, 379, and cases there cited; Clarke v. White, 12 Pet. [37 U. S.] 178, 199; May, Fraud. Conv. 86, and cases there cited; Russell v. Rogers, 10 Wend. 473, 479; Wiggin v. Bush, 12 Johns. 306, 309; Bean v. Brookmire, [Case No. 1,169;] Dauglish v. Tennent, L. R. 2 Q. B. 49, 54. Not only are such secret agreements not enforced, but money paid under them is allowed to be recovered back by the debtor, as having been obtained in violation of the principles of public policy, and affirmative relief is given to the debtor against such agreements, even where they are not forbidden by an express statute. Smith v. Bromley, Doug. 696, note; Jackman v. Mitchell, 13 Ves. 581; Wood v. Barker, L. R. 1 Eq. 139. Nor is it material, whether the secret agreement gives to the favored creditor a larger sum, or an additional security or advantage. Eastabrook v. Scott, 3 Ves. 456; Constantein v. Blache, 1 Cox, Ch. 287. The case of Cullingworth v. Loyd, 2 Beav. 385, shows, that, although there is no general meeting of creditors, nor any agreement entered into by the creditors generally, yet, if a proposition is made to the creditors at large to pay them all a composition on certain terms, no creditor can ostensibly accept such composition, and sign the deed which expresses his acceptance of the terms, and, at the same time, stipulate for, or secure to himself, a peculiar and separate advantage, which is not expressed upon the deed. In Leicester v. Rose, 4 East, 372, 383, it is said, that the fraud, in such a case, may consist in putting the favored creditor in a better situation than the other creditors; that it is not necessary he should stipulate to receive more money than the others; but the fraud may consist in receiving that which is meant to pro-

[3] [From 8 N. B. R. 228.]

cure him more money, namely, a better security for the same sum; and that it is a fraud on the creditors at large, for a person to hold out that he will come in under the general agreement, by signing the deed when presented to him separately, and then to stipulate for a further partial benefit to himself.

The leading cases on the subject are reviewed in Breck v. Cole, 4 Sandf. 79, and the conclusion is thus stated: "It is the clear and inevitable result of the decisions, that, where a composition is made with creditors, every security given to a particular creditor, not provided for in the terms of the deed, and not disclosed, is void, as a fraud upon the creditors from whom it is concealed, and, where it is taken from the debtor himself, as a condition of his discharge, is void upon the ground of duress, as well as of fraud." It is also said, in that case, that it makes no difference, that the secret agreement does not have, and cannot have, the effect of depriving the other creditors of any portion of the amount they had agreed to receive; that it is sufficient if a fact is concealed which it was material for them to know, and the knowledge of which might have prevented them from assenting to the composition; and that, upon a composition deed, all the parties are supposed to stand in the same situation, and, if there is any one who refuses to do so, he must announce it at the time, it being impossible to say, that those who signed the deed in the confidence that, under it, the rights of all would be equal, would have signed it at all, if it had been known to them that a better security was to be given to any one creditor than that which, by the terms of the deed, all had consented to take. These views are approved by Judge Woodruff, in Carroll v. Shields, 4 E. D. Smith, 466. The case of Pinneo v. Higgins, 12 Abb. Pr. 334, is very much like the present one. There, the favored creditor held out to the debtor that he would unite in the composition, if the other creditors did. When all the other creditors had signed, he sought to obtain better terms, and then agreed to sign if those terms were complied with, and finally did sign because they were complied with. In that case, it was urged, that no creditor was induced to sign because the favored creditor had signed. But the court held, that it was of no consequence whether the name of the favored creditor was the first that was signed to the composition agreement, or the last; that he, by signing, entered into an agreement with the other creditors, as well as with the debtor; and that the separate agreement was equally void, whether made after all the other creditors had signed, or whether before, or after, the creditor who made it had signed.

It is contended, for the defendants, that the present case does not fall within the principles thus settled, because it was expressly provided, in the composition agreement, that

it was not to be binding on any one, unless agreed to and signed by all the creditors, and it was not signed by all the creditors; and because the defendants bargained for fifty per cent. only of their claim, and threw away twenty per cent. of it; and because Reuss & Co. were authorized to sign only after all the other creditors had signed, and there were creditors who did not sign at all, and such condition was not waived either by Reuss & Co., or by the defendants. The ground taken is, that, as the composition agreement never had any binding force as against the defendants, the payment to them of fifty per cent. of their debt did not violate any rights of the other creditors under the compromise. The difficulty with this view is, that it overlooks the true relations of the defendants to the other creditors. The defendants and Reuss & Co. supposed, as is evident from the letter of the 16th of March, 1869, from the latter to the former, that all the other creditors had signed. They, therefore, acted on that view, in taking the fifty per cent., and pretending to assent to the compromise terms, and concealing from the other creditors the special arrangement. So, too, the other creditors, inasmuch as the deed, by its terms, provided that all the creditors must sign before the composition should be binding, had the right to suppose, in receiving their composition notes, that all the creditors had signed, and that all were to receive like notes, and nothing further. They acted on that view, in taking their notes. Hence, not only must the agreement, for the purposes of this case, be regarded as having been signed by all the creditors, but each creditor has a right to stand as if the defendants had signed before him.

Nor does it make any difference that there may not, in fact, have been any manual tradition of the compromise notes to Reuss & Co., or to the defendants. The letter of the 8th of March, 1869, from the defendants to Reuss & Co., states, expressly, that the fifty per cent. is to be received as a "discount" of the compromise notes, and that those notes are to be discounted on the signing of the agreement by Reuss & Co. Therefore, the signing, the receipt of the compromise notes, and their "discount," were to be simultaneous acts; and the defendants, having accepted the "discount," and retained it, under that arrangement. are estopped from saying that the compromise notes were not received by them, or that Reuss & Co. had no authority to sign the agreement, or that it was not binding because all the creditors did not sign it. The defendants did not treat separately in respect of their debt, but as a part of the general creditors, all of whom were, as they knew, to be invited to accede to the same terms.

Nor is there any force in the fact that the defendants obtained only fifty per cent. of their claim instead of seventy per cent. By obtaining the fifty per cent. they substan-

tially exhausted a large part of the resources of the debtors. They intended to make it sure that they should obtain the whole of their fifty per cent. before any of the compromise notes which the other creditors were to receive should fall due, and they further intended to make it sure, by signing last, that no creditor should be left free to proceed against the debtors on his original claim, so as to prevent the payment of the whole of the fifty per cent. It is to be assumed that other creditors would have preferred such an arrangement as the defendants made. At all events, it is to be assumed that others who signed would not have signed, had they known of the private arrangement with the defendants, which was to strip the debtors of a large part of their means of paying the six months' compromise notes. The amount of such notes, actually given, was $24,768 39. The amount of the defendants' first compromise note, at seventy per cent., would have been $7,595 38. Before half of the six months had elapsed, the defendants had exacted from the debtors $16,275 83. The position of the creditors who have been defrauded by the private agreement would have been no different from what it is, if all the creditors had signed the compromise agreement; or if, all signing it, the defendants had not signed last; or if, only a part signing it, including the defendants, the defendants had not signed last. Such position, too, is the same it would have been, if all the creditors signing the compromise agreement, the defendants had signed it first; or, only a part signing it, including the defendants, the defendants had signed it first.

The suggestion, that, if the compromise at seventy cents had been carried out, Kintzing & Co. were solvent, has no force, except to show, that the defendants, by rendering it, through their fraud, impossible that the compromise should be, carried out, made Kintzing & Co. insolvent.

It being clear, therefore, that the transaction was a fraud on the creditors, the right of the plaintiff to recover back the money, for such creditors, is equally clear. Whether the money could or could not be recovered back by the debtor, the 14th section of the bankruptcy act especially vests in the assignee all property conveyed by the bankrupt in fraud of his creditors, and authorizes him to sue for and recover the same. This applies to conveyances fraudulent at common law, and to transfers of property such as that in the present case. Knowlton v. Moseley, 105 Mass. 136; Bean v. Brookmire, [Case No. 1,169.]

It is contended, that the bankruptcy proceedings were against Kintzing alone, and not against Lindsley also, and not against the firm; that the plaintiff is the assignee only of Kintzing individually, and not of the assets of the firm; that the copartnership was never dissolved; that the plaintiff does not represent the interest of Lindsley in the

claim sought to be recovered in this suit; and that Lindsley has an interest in it, which did not pass to the plaintiff. It is apparent, from the evidence, that the firm was regarded as dissolved by all parties concerned, by Kintzing, by Lindsley, and by the creditors, including the defendants, and that the assets and effects of the firm were regarded as being put into Kintzing's hands, in trust, to settle up the business, as the appointee of the creditors, and pay the compromise notes. Kintzing passed into the hands of the state assignee all that was left of such assets, as being part of the estate of Kintzing. From the state assignee they passed to the plaintiff, as the assignee of Kintzing, as part of the estate of Kintzing.

But, there is another view of the matter. The composition deed does not appear to have been assented to in any manner by Lindsley. He is not named in it, nor was he, so far as appears, a party to it, potentially. The deed is made between "Charles S. Kintzing & Co." and his creditors. There does not seem to have been any authority, so far as Lindsley was concerned, to sign the firm name to the compromise notes, so as to bind him by them. The compromise notes, therefore, signed by Kintzing with the firm name, were the individual notes of Kintzing. Having given them, he was to have the assets to administer, with which to pay them. This was the view of the creditors and of the bankruptcy court. The petition states, that the petitioners are creditors of Kintzing, a member of the late firm, and that his debts to them are two of these six months' compromise notes, signed in the name of Charles S. Kintzing & Co., but given by Kintzing, and that he committed all of the alleged acts of bankruptcy, one among them being the preferential payment by him to the defendants, as creditors of his, of the moneys before mentioned; and the prayer of the petition is, that Kintzing, so doing business as Charles S. Kintzing & Co., may be declared bankrupt. The defendants, as before shown, having really accepted the compromise notes, and received the fifty per cent. as a discount of those notes, and those notes, as well as all the other compromise notes, being really only the individual notes of Kintzing, and it appearing that the moneys paid to the defendants were paid by Kintzing out of the general funds of Kintzing, it follows, that, although those funds may have been, in part, the proceeds of the assets of the former firm, and although it may appear, on a calculation, that Kintzing was a debtor to such former firm, in respect of the assets he received and converted into money, to an amount sufficient to cover the payments to the defendants, yet the claim sought to be recovered in this suit is a claim belonging to the estate of Kintzing and recoverable by the plaintiff, as his assignee. How the plaintiff shall distribute the amount of the recovery, under the direction of the bankruptcy court, as between persons who were creditors of the former firm, (including those who received and those who did not receive compromise notes,) and persons who, though creditors of Kintzing, were never creditors of the former firm, is a question not involved in this suit.

There must be a decree for the plaintiff, for the several amounts of money paid to the defendants, with interest, and costs.

[NOTE. On defendants' appeal to the supreme court, this decree was reversed, upon the ground that the assignee of the senior partner had no such title as would enable him to call third parties to account for partnership property. In speaking for the court, Mr. Justice Clifford said:

["Money paid under such circumstances, if it can be recovered back at all, must be claimed by the partnership in whose behalf it was paid, or by an assignee duly appointed to administer the joint estate, as it is quite clear that neither an individual partner nor his assignee can call the party to whom such a payment has been made to an account for such a payment, any more than he could for any other debt due to the copartnership. If liable in fact, a voluntary payment to the appellee would not discharge the obligation, as the liability, if it exists, is to another party; nor would a judgment in this case, even if satisfied, be a bar to a subsequent suit in the name of the partnership or their duly appointed assignees.

["Two principal suggestions are made in support of the theory set up by the appellants: (1) That all the parties concerned in the attempt to effect a compromise between the debtors and their creditors proceeded as if the copartnership had previously been dissolved, and as if the assets and effects of the debtor firm had been placed in the hands of the senior partner in trust to settle up the affairs of the debtors with their creditors, and to pay the compromise notes. (2) That the other partner never assented to the compromise agreement, nor was he, in fact, a party to the final arrangement, and that the copartnership name was signed to the compromise agreement and to the notes without his authority.

["Issuable matters are certainly involved in those propositions, but, suppose they are fully proved, they are not sufficient to show that the other partner ever conveyed his interest in the assets and effects of the copartnership to the bankrupt partner, or that he ceased to be a joint owner of the same when the estate of the bankrupt partner was assigned and conveyed to the complainant below, as his assignee. Harrison v. Sterry, 5 Cranch, (9 U. S.) 302. Nothing is exhibited in the record to warrant the conclusion that the copartnership was ever in fact dissolved before the decree in bankruptcy against the senior partner, and, as the compromise notes were given in the name of the copartnership, the other partner remained liable for their payment."

[The case was remanded to the circuit court, with directions to dismiss the bill of complaint. Amsinck v. Bean, 22 Wall. (89 U. S.) 395.

[For other cases involving this bankruptcy, see Bean v. Brookmire, Cases Nos. 1,168–1,170; Bean v. Laflin, Case No. 1,172; Brookmire v. Bean, Id. 1,942; Kinsing's Assignee v. Bartholew, Id. 7,831; In re Kintzing, Id. 7,833.]